UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARC LILLY, NOT IN HIS INDIVIDUAL CAPACITY BUT AS THE REPRESENTATIVE FOR THE FORMER SHAREHOLDERS OF VIEOSOFT, INC., <br><br> Plaintiff, <br><br> v. <br><br> ENVOY, LLC; EMDEON, INC.; EMDEON BUSINESS SERVICES, LLC; TOM GROOM (named as an indispensable party), <br><br> Defendants. | Case No. C15-0742RSM <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I.   INTRODUCTION

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment on all remaining claims against them. Dkt. #79. Defendants argue: 1) that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law because Plaintiff could have anticipated the actions complained of; and 2) Plaintiff's express breach of contract claim fails because Defendants had the express right to terminate the agreement in their sole discretion and he cannot rely on a frustration defense because he could have anticipated what occurred. *Id.* Plaintiff opposes the motion, asserting that he and the other shareholders have not been paid even the "guaranteed" monies under the contract, and that there are factual

ORDER – 1

questions as to the nature of the parties' obligations under the contract which preclude summary judgment. Dkt. #93 (*filed under seal*). For the reasons set forth below, the Court now GRANTS Defendant's Motion for Summary Judgment.

## II.   BACKGROUND

Viewing the facts in the light most favorable to the non-moving party – in this case Plaintiff – the Court sets forth the following factual background to this matter.[1] *See* Fed. R. Civ. Proc. 56.

This matter involves a dispute arising out of a Stock Purchase Agreement ("SPA") after the merger and acquisition of a Washington start-up corporation by a larger national corporation. Emdeon[2] is a leading provider of revenue and payment cycle management and clinical information exchange solutions. Dkt. #86, Ex. 1 at 4. Emdeon has a well-developed network of payers and providers that connects "to virtually all private and government payers, claim-submitting providers and pharmacies." *Id.* Vieosoft was a Washington start-up company founded by four principal shareholders: Peter Hoover, Marc Lilly, John Eastman and David Grant (the "Shareholders"). Dkt. #86, Ex. 2 at 1 and 6. These Shareholders have substantial prior industry experience with e-prescription solutions. Dkt. #86, Ex. #2 at 1. At the time of acquisition,

---

[1] In reviewing this motion, the Court utilized the publically-filed briefs and exhibits, as well as the unredacted briefs and exhibits filed under seal. In this Order, the Court cites to the sealed documents it reviewed, where applicable, and has not included the parallel citation to the redacted version of the same document. However, the Court notes for the public that any citation to a sealed document can be found at the same pages of the public, redacted versions of the briefs and exhibits. The Court further notes that in an effort to preserve the confidentiality of the information that has been sealed, the Court discusses such information only in general terms. The discussion of such information in that manner is not intended to imply that the Court did not examine the entire record before it.

[2] Defendant corporations have changed corporate names since the merger and filing of this matter. For ease of reference, the Court will refer to Defendant corporations collectively under the former name "Emdeon" unless the discussion of a specific corporation is necessary.

ORDER – 2

Vieosoft had only "trade secrets and other intellectual property" as assets. *Id.*, Exs. #2 at 6 and #3 at 21. Emdeon acquired Vieosoft "primarily to obtain the talent and business plan to build a next-generation, patient-centric pharmacy hub that will compete successfully against SureScripts, Inc. and position Emdeon as a leading provider of ePrescribing, patient history, eligibility, dynamic formulary, patient messaging and related analytics services." *Id.*, Ex. 4 at 6. Emdeon valued Vieosoft's assets at approximately $8.8 million (consisting of non-compete agreements, business plan, know-how, and goodwill). *Id.*, Ex. 4 at 7.

Acquisition negotiations were conducted between mid-2012 and closing on February 12, 2014. In July 2013, the parties executed an interim Professional Services Agreement ("PSA") providing that, for $250,000, Vieosoft would "work in good faith with Emdeon towards finalization of the development and agreement for the Staged Development Plan" for development of "a next-generation pharmacy platform . . ." *Id.*, Ex. 5 at 12-13. The PSA contains an exclusivity provision, preventing Vieosoft from negotiating with other potential acquirers or investors. *Id.* at 6, § 11.14.

As originally conceived, Emdeon would pay Vieosoft a $1.7 million development fee in exchange for an option to purchase all Vieosoft stock. Dkt. #86, Exs. 6 at 11:25-13:14 and 7 at 5. Vieosoft would use the funds to develop certain software and Emdeon would also build certain components. *Id.*, Exs. 6 at 15-25 and 7 at 5. In addition, during an 18-month development window, Vieosoft would operate independently. *Id.*, Ex. 7 at 6. If Emdeon declined to exercise its purchase option, the parties would part ways, without non-competes or other restrictive covenants. Emdeon's counsel drafted the deal documents. *Id.*, Exs. 6 at 15:11-17 and 8 at 1.

ORDER – 3

In October 2013, Emdeon hired a new CEO, Neil de Crescenzo. He restructured the deal with Vieosoft as a straight acquisition with an earn-out. Dkt. #86, Ex. 9 at 97:5-20, 100:10-101:1, 101: 20-102:5. Emdeon's counsel redrafted the deal documents. *Id.*, Exs. 10 and 6 at 34:5-35:22. Under the new structure, Vieosoft shareholders would receive $2.75 million in upfront consideration and a guaranteed additional $5 million as a minimum payment in the event Defendants terminated the SPA. Dkt. #80, Exs. B at 87:9-88:2 and G. After several drafting revisions, reviewed by counsel for all parties, the parties executed the SPA on February 12, 2014, and Emdeon purchased Vieosoft's stock.[3] *See* Dkts. #80, Exs. G, H, I and J and #86, Ex. 11.

As noted above, through the Vieosoft acquisition, Emdeon planned a "product development initiative to build a next-generation patient-centric pharmacy hub that will compete successfully against Surescripts". *Id.*, Ex. 2 at 1. This initiative consisted of two components: a product that would provide parity to Surescripts ("Core"), and advanced functionality that would drive adoption and revenue. *Id.*, Ex. 3 at 25 and 29. The parties drafted a detailed Development Plan, setting forth certain Milestone Objectives, which was incorporated by reference into the SPA. *Id.*, Ex. 11 at §§ 1.5 and 1.6.

Shareholders Peter Hoover, Marc Lilly, David Grant, and John Eastman agreed to work for Emdeon (as employees or consultants) to implement the Development Plan. As a condition of the SPA, they were subject to five-year non-compete agreements. *Id.*, Ex. 11 at § 9.4. The non-competes were a "requirement of the negotiation," *id.*, Ex. 9 at 102:13-17, and they survive termination of the SPA. *Id.*, Ex. 11 at § 6.3.

---

[3] During negotiations, Emdeon specifically rejected proposals by the Shareholders for provisions preventing Emdeon from taking actions intentionally designed or substantially likely to prevent the ability of the Shareholders to meet the Milestone Objectives, further discussed below. Dkt. #80, Exs. K and E at 19:18-20:9, 27:2-25 and 49:21-50:4.

ORDER – 4

The SPA set forth the administration of the Development Plan:

> The Executive Vice President – Pharmacy Services of Emdeon, shall be responsible for administration of the Development Plan, including, but not limited to, overseeing the management structure and other personnel involved with the execution and continued performance of the Development Plan, guiding the strategic direction in the development of products under the Development Plan, determining the timing and amount of capital investments to be made by Emdeon, implementing modifications to the Development Plan (subject to Section 1.7(d)(vii) hereof), determining the satisfaction of the Milestone Objectives set forth in the Development Plan, the calculation of Eligible Revenue and Minimum Gross Profit Margin, the determination and calculation of any Additional Consideration payments to be paid to the Shareholders pursuant to Section 1.7 of this Agreement, and the determination and calculation of any RxCentrix Payments to be paid pursuant to Section 1.8 of this Agreement. It is acknowledged and agreed that (i) Emdeon will have the authority and freedom to operate the Business and the Company following the date hereof without limitation under this Agreement, and (ii) Emdeon makes no representations or warranties with respect to the results of operations of (A) the Business, (B) the Company or (C) the Solution, or the generation of Eligible Revenue following the Closing or with respect to any estimates or projections provided by Emdeon to the Shareholders or the Shareholders' Representative with respect to such results of operations.

Dkt. #86, Ex. 11 at § 1.6.

Emdeon began developing the bulk of Core (eligibility, medication history, and membership roster load) at its Fort Worth, TX, facility in summer 2013. The Development Plan provides that Emdeon was responsible for delivering these components, and the deposition testimony of executive Kevin Mahoney confirms that understanding. *Id.*, Exs. 13 at 2 and 9 at 53:8-54:19 and 71:2-72:6. Based on their expertise with similar projects, the Shareholders, through the Development Team, were to develop the Batch Formulary component of Core. *Id.*, Ex.2 at 1. Batch Formulary would allow delivery of a set of authorized medication lists for insurers and pharmacy benefit managers to providers. Ex. 13. The Shareholders, through the Development Team, would also develop advanced functionality software that would: (a) allow

ORDER – 5

real-time updating of formulary lists by payors (Advanced Formulary); (b) present medication and delivery alternatives at the point of prescription (Formulary Optimizer); and (c) allow payors to message providers and patients during this prescription process (Targeted Messaging). Dkt. #86, Ex. 13.

The Development Plan specified Batch Formulary, Advanced Formulary, Formulary Optimizer, and Targeted Messaging as "Milestone Objectives." The SPA set a completion date of December 31, 2014, for the Milestone Objectives. Dkt. #86, Exs. 11 at § 1.5(a) and 13 at 2. The Development Plan included a detailed schedule guiding the Team's timeline. Dkt. #86, Ex. 13. In its SEC Form 10-K for the year ending December 31, 2014, Emdeon stated that there was a 90% probability that the Milestone Objectives would be completed. *Id.*, Ex. 1 at 11.

Upon closing of the SPA, assuming completion of the Milestone Objectives, the former Vieosoft shareholders had the opportunity for certain earn-out payments. Dkt. #80, Ex. A at § 1.7. The shareholders also had the opportunity to receive future contingent revenue-sharing payments. *Id.* Emdeon could also terminate the SPA if the Shareholders did not complete the Milestone Objectives, subject to notice and opportunity to cure. *Id.*, Ex. 11 at § 6.1. In the event of termination, the Shareholders were guaranteed a $4.75 million payment.[4] Dkt. #79 at 2.

Following execution of the SPA, Shareholders hired a Development Team in Seattle. Emdeon provided the budget, and Peter Hoover was placed in charge. *Id.*, Exs. 16 at 95:6-98:24 and 9 at 147:23-148:11 and 199:21-200:9. Shortly thereafter, Emdeon made the decision to move its development platform from traditional Microsoft servers to an Amazon-based platform,

---

[4] To date, that payment has not been made because Plaintiffs pursued this litigation. Dkts. #80, Ex. N and #86, Ex. 12.

ORDER – 6

"AWS." *Id.*, Exs. 17 at 5 and 18 at 40:10-43:11. This move represented a "paradigm shift" for the Development Team. *Id.*, Ex. 16 at 90:23-91:4. "[I]t would be the equivalent to saying, instead of building a train, we are now building an airplane. They're both vehicles for transportation, but they are fundamentally different." *Id.*, Ex. 16 at 91:1-4.

In early March 2014, Torsten Kablitz (hired in February 2014 by Emdeon to lead technical aspects of the Development Team) visited Emdeon's Fort Worth facility to assess Emdeon's progress on its Core deliverables. Mr. Kablitz reported that development was substantially delayed, would not be complete on time, and might not integrate well with the new plan to develop on AWS. *Id.*, Exs. 19 and Ex. 16 at 128:20-134:3. As a result, he recommended that

> . . . all work on Project Victory at Fort Worth is stopped, archived and transferred to Seattle. The Seattle team will be task [sic] with the ownership of the deliverables for all of Project Victory including these components. It will be up to team Seattle to build support for these workflows into the core product offering.

Dkt. #86, Ex. 19 at 1. Emdeon's CEO accepted the recommendation and approved the transfer of development of Emdeon's Core deliverables to the Seattle Development Team. *Id.*, Ex. 9 at 183:4-17.

In the winter of 2013-14, Emdeon began considering whether it should migrate from its incumbent master person index ("MPI") tool – IBM Initiate (the industry standard) – to something cheaper, like Oracle's MPI tool.[5] *Id.*, Ex. 20 at 1-2.

In July 2014, Emdeon hired Doug Hebenthal and placed the Development Team under his control. *Id.*, Exs. 24 and 9 at 199:2-200:19. By December 2014, the Development Team released

---

[5] The MPI tool is a complex algorithm that helps identify patients and collect patient records across disparate data sets. Dkt. #86, Ex. 23 at 137:16-138:14.

ORDER – 7

an initial version of Core including Batch Formulary (Milestone Objective), Member Roster Load (Emdeon deliverable), Eligibility (Emdeon deliverable), and Medication History (Emdeon deliverable). *Id.*, Ex. 25 at 2. The Development Team was also working on a substitute MPI tool for Core. *Id.*, Ex. 48.

In the Fall of 2014, Marc Lilly urged Mr. Kablitz to move ahead with the remaining Milestone Objectives. *Id.*, Ex. 16 at 172: 15-173:3. However, Mr. Kablitz could not assign any engineering resources to that work because those resources were tied up with completing Core. *Id.* at 174:6-176:2 and 66: 13-67:8.

As a result, Mr. Hoover began conversations with Mr. Mahoney about modifying the timelines for the Milestone Objectives. *Id.*, Ex. 9 at 197:14-198:3. Mr. Mahoney and other Emdeon executives appeared receptive. *Id.*, Exs. 9 at 198:4-14 and 32. One executive noted that there was "a mismatch between the four guys and their payouts and the project plan we are following." Dkt. #86, Ex. 32.

On January 19, 2015, Mr. Hoover delivered a Completion Certificate to Emdeon, outlining the work accomplished on the Development Plan in 2014. *Id.*, Exs. 43 and 9 at 260:14-16. The Certificate did not state that the Development Team had completed anything. *Id.*, Ex. 9 at 21-23. During the week that followed, Mr. Mahoney met with Mr. Hebenthal and executive Rob Calichman to consider how to respond to the Completion Certificate. *Id.* at 262:13-265:13. Mr. Mahoney recommended giving the Shareholders additional time to complete some aspects of the Development Plan. *Id.* at 265:2-5. Ultimately, Mr. de Crescenzo decided against any modification of the Development Plan. *Id.* at 259:24-260:6.

Shortly thereafter, on February 2, 2015, Emdeon issued a default notice pursuant to SPA § 1.5(b). *Id.*, Ex. 34. Emdeon acknowledged that it had waived completion of some portions of the Milestone Objections by December 31, 2014, but gave the Shareholders until April 15, 2015, to cure and complete the remaining Milestone Objectives. *Id.*, Ex. 34 at 2-3. On the same date, Emdeon issued Termination Notices to shareholders Marc Lilly and David Grant. *Id.*, Ex. 35. Emdeon also terminated shareholder John Eastman. *Id.*, Ex. 9 at 264:5-8. Plaintiff now asserts that during the cure period they were not provided any resources to focus on the Milestone Objectives, and therefore, the Team did not complete them. Dkt. #85 at 14.

On April 29, 2015, Emdeon issued a "Rejection Notice and Notice of Termination," stating that "Emdeon is terminating the Purchase Agreement" and would make the minimum termination payment to the Shareholders within 30 days. Dkt. #86, Ex. 37.

On April 30th, Emdeon terminated Peter Hoover. Dkt. #86, Ex. 38 at 2. However, development of the advanced projects continued. *Id.* Emdeon hired former Vieosoft shareholder, Richard Jay, to serve as the Product Owner for Formulary Services and to support the sales team. *Id.*, Ex. 39.

On May 12, 2015, Marc Lilly, as shareholder representative, filed this suit against Emdeon. Dkt. #1. Approximately one week later, Emdeon terminated the sales team, including Richard Jay. Dkt. #86, Ex. 41 at 4.

### III.   DISCUSSION

**A. Standard of Review for Motions of Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

ORDER – 9

R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

### B. Applicable Law

The parties agree that this matter is governed by Delaware law. Accordingly, the Court applies such law to the instant motion.

### C. Breach of Contract

The Court first examines Plaintiff's breach of contract claim. Plaintiff asserts that Emdeon breached the Stock Purchase Agreement, and the Development Plan incorporated therein, by:

- Failing to deliver the three Core products for which it was responsible and shifting these development responsibilities to the Development Team;

ORDER – 10

- Requiring the Development Team to pioneer AWS infrastructure within Emdeon, a useful but unplanned for and time-consuming effort;
- Not making IBM Initiate available, forcing the Development Team to create an MPI tool;
- Failing to modify the Development Plan to reflect changed circumstances;
- Taking away control of the Development Team and not allowing it to work on the Milestone Objectives during 2014 or the cure period;
- Terminating key shareholders and frustrating any opportunity to cure;
- Unjustifiably terminating the SPA; and
- Failing to make the "guaranteed" termination payment.

Dkt. #93 at 16-17 (*filed under seal*).

Defendants argue that the explicit language of the SPA defeats Plaintiff's arguments. Specifically, Defendants point to § 1.6, which allowed them to operate the business as they saw fit. Dkt. #79 at 19-21. Plaintiff responds that these alleged breaches are not controverted by the language in § 1.6 giving Emdeon general "authority and freedom to operate the Business." Dkt. #93 at 17. Rather, Plaintiff asserts that Emdeon's express obligations and freedom to operate must be read in harmony with the remaining portions of the section and Agreement, otherwise Emdeon's express obligations are surplusage. *Id.*

As the Supreme Court of Delaware has long held, "'Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party.'" *Salamone v. Gorman*, 106 A.3d 354, 368, 2014 Del. LEXIS 583 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

ORDER – 11

When interpreting a contract, Delaware courts "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all its provisions. *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract." *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003).

The parties in this case focus on section 1.6 of the SPA. That section of the contract clearly provided Emdeon with unfettered discretion to run the business and direct the Development Plan in the way it saw fit. Dkt. #86, Ex. 11 at § 1.6. The SPA provided that the Executive Vice President – Pharmacy Services of Emdeon would be responsible for the administration of the Development Plan. *Id.* Such administration included, *but was not limited to*, determining the timing and amount of capital investments, implementing any modifications to the Development Plan, the calculation of any additional consideration payments, and, more importantly, determining the satisfaction of the Milestone Objectives. *Id.* Emdeon then expressly reserved the right to operate the business "without limitation under this Agreement," making "no representations or warranties with respect to the results of operations . . . ." *Id.* There is no reasonable way to read any obligation by Emdeon to ensure the Shareholders could meet their contractual obligations.

This interpretation is consistent with the language of other provisions of the SPA. For example, with respect to the Shareholders' obligations to provide the Milestone Objectives, Emdeon reserved the right to determine whether such Objectives had been completed successfully, and if they were ultimately unsuccessful, the right to terminate the Agreement or allow modifications to the timeline for delivery. Dkt. #86, Ex. 11 at § 1.5(c)(ii). Moreover, if Emdeon allowed the Shareholders to continue to work on the Milestone Objectives until completed to their reasonable satisfaction, the Shareholders would not be eligible for their Milestone Payment. *Id.*, § § 1.5(c)(ii)(B) and 1.7(a). The contract language as a whole reflects the intent by the parties that Emdeon would be in sole control of the way the business would be run and the way the Development Plan would be administered, without any promises to the Shareholders about the results of such administration.

To the extent that Plaintiff argues ambiguity in the contract, this Court finds none. Contractual ambiguity exists "'[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). The Court finds that the language discussed above is not susceptible of any alternate meaning. However, even if it was, the intent of the parties appears to also be clear. Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'" *Id.* In this case, the Shareholders had specifically attempted to negotiate language that would require Emdeon to perform the tasks and actions described in the Development Plan, and language prohibiting Emdeon from taking any action intentionally designed or substantially likely to

prevent the ability of the Shareholders to complete the Milestone Objections. Dkt. #80, Exs. J and K. These proposals were rejected. Significantly, Emdeon also rejected a proposal for a provision that would prevent Emdeon from asserting that the Milestone Objectives had not been completed if such failure had been caused by Emdeon's failure to perform any of its material obligations under the Development Plan. *Id.*, Ex. E at 19:18-20:9 and 49:21-50:4 and Ex. K at § 1.4(d)(ii).

As a result, the Court concludes that Defendants did not breach the SPA by taking the actions of which Plaintiff complains in this matter, and therefore Plaintiff's breach of contract claim must fail as a matter of law.

**D. Frustration**

Plaintiff argues that material facts are in dispute as to whether Defendants frustrated the Shareholders' performance of their obligations under the SPA, and therefore summary judgment is not appropriate. Dkt. #85 at 19-20. Plaintiff argues that Defendants prevented them from completing the Milestone Objectives and are therefore stopped from alleging that the Shareholders' breached the SPA. *Id.* at 19. However, the very authority upon which Plaintiff relies, undermines his argument. Indeed, in *A.I.C. Ltd. v. Mapco Petroleum*, the District Court of Delaware explained:

> "The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party *wrongfully prevented* performance of that condition precedent." *Mobile Communications Corp. of America v. MCI Communications Corp.*, No. 8108, 11 Del.J.Corp.L. 680, 685 (Del.Ch. Aug. 27, 1985) (emphasis and footnote added).
>
> One who *unjustly* prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own

ORDER – 14

> *wrong*, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was pr[e]mised. One who himself induces the failure of the other to perform within the time agreed upon cannot take advantage [**25] of such failure . . . .

3A A. Corbin, *Corbin on Contracts* § 767, at pp. 540-41 (1960) (emphasis added, footnote omitted). Other authorities contain similar descriptions of the prevention doctrine. *See, e.g., District-Realty Title Ins. Corp. v. Ensmann*, 247 U.S. App. D.C. 228, 767 F.2d 1018, 1023 (D.C.Cir. 1985) (the prevention "doctrine excuses a condition precedent when a party *wrongfully prevents* the condition from occurring" [emphasis added]); *Shear v. National Rifle Ass'n of America*, 196 U.S. App. D.C. 344, 606 F.2d 1251, 1254-55 (D.C.Cir. 1979); *Restatement (Second) of Contracts* § 245 (1979); 5 S. Williston, *A Treatise on the Law of Contracts* § 677A, at p. 234 (3d ed. 1961) ("justice . . . precludes a promisor from taking advantage of a condition, the performance of which he himself prevented").

Translating the prevention doctrine into the context of the instant case would produce the following rule. A promisor (i.e. Mapco) may not escape contractual liability (i.e. the payment of compensation to AIC under the consulting agreement) by reliance upon the failure of a condition precedent (i.e. formation of the proposed asset sale transaction) where the promisor *wrongfully prevented* the occurrence of that condition precedent.

There is a well recognized exception to the prevention doctrine, however, which forcefully applies in this case. The Court of Chancery of Delaware has held that "the prevention doctrine does not apply where, under the contract, one party *assumes the risk* that fulfillment of the condition precedent will be prevented." *Mobile Communications Corp. v. MCI*, 11 Del.J. Corp.L. 680, 686 (emphasis added). *See also District-Realty v. Ensmann*, 767 F.2d at 1023-24 ("When a contract 'authorizes a party to prevent a condition from occurring, 'there is no prevention.' . . . The essential inquiry is whether or not the contract *allocated the risk* of" nonoccurrence of the condition. [emphasis added]); *Shear v. National Rifle Ass'n*, 606 F.2d at 1256 ("the prevention doctrine does not apply when the contract, in effect, authorizes prevention"); *Dixon v. Bernstein*, 86 U.S. App. D.C. 336, 182 F.2d 104, 105 (D.C.Cir. 1950); 3A *Corbin on Contracts* § 767, at p. 545 ("there are some cases in which some sort of prevention or interference is contemplated by the parties as quite proper and within the privileges of the promisor"); 5 S. Williston, *A Treatise on the Law of Contracts* § 677A, [**27] at p. 235 ("an exception to [the prevention doctrine] must be made where the hindrance is due to some action of the promisor which under the terms of the contract . . . he was permitted to

> take"). *Cf. Restatement (Second) of Agency* § 453 comment a (1958) (in the context of a brokerage contract, "the parties are bound by the bargain which they make and if, adverting to the possibility of termination before performance is completed, they provide that no compensation shall be given for merely part performance, such agreement is enforced").
>
> The prevention doctrine can have no application to this case. The consulting agreement provides, in unambiguous and painstakingly crafted language, that Mapco had no duty whatsoever to enter into any of the contemplated underlying transactions, such as the proposed asset sale. It explicitly provides that "nothing [therein] requires [Mapco] to enter into any agreement with the Nigerian Government and/or NNPC or to sell any or all of its Refining and Marketing Assets." (D.I. 1, Ex. A at 2.) AIC, having agreed to be contractually bound by such language, cannot be heard to now argue that Mapco's failure to consummate the asset sale transaction *wrongfully prevented* AIC from earning its compensation under the consulting agreement. The consulting agreement is susceptible to but one reasonable reading: that AIC *assumed the risk* that Mapco would opt not to form the contemplated asset sale transaction. AIC's prevention argument is thus without merit.

711 F. Supp. 1230, 1238-39 (D. Del. 1989).

The same reasoning applies here. Plaintiff and his fellow Shareholders assumed the risk that Defendants would not run the business in a way that allowed them to fulfill the Milestone Objectives, as discussed above. Accordingly, the Court finds that the prevention doctrine has no application in this case.

**E. Claim for Breach of Implied Covenant of Good Faith and Fair Dealing**

Defendants next argue that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law because Delaware courts narrowly construe this covenant and will not apply it to displace explicit contract terms or to insert terms that a party could have obtained through negotiation. Dkt. #79 at 15-19. Plaintiff responds that the parties' expectations at the time of contract were thwarted by Emdeon, and that Emdeon acted arbitrarily

and unreasonably by creating a situation in which the Shareholders could not meet their contractual obligations. Dkt. #85 at 23-25.

In all contracts under Delaware law, there is an implied covenant of good faith and fair dealing. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal citation omitted); *see also Katz v. Oak Indus.*, 508 A.2d 873, 880 (Del. Ch. 1986) ("Modern contract law has generally recognized an implied covenant to the effect that each party to a contract will act in good faith towards the other with respect to the subject matter of the contract."); *Fitzgerald v. Cantor*, 1998 Del. Ch. LEXIS 212, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) ("All contracts are subject to an implied covenant of good faith and fair dealing."); 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2000) ("Every contract imposes an obligation of good faith and fair dealing between the parties in its performance and its enforcement, and if the promise of the defendant is not expressed by its terms in the contract, it will be implied."). The covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) (quoting *Nemec v. Shrader*, 2009 Del. Ch. LEXIS 67, 2009 WL 1204346, at *5 (Del. Ch. Apr. 30, 2009)). A party is liable for breaching the covenant when its conduct "frustrates the overarching purpose of the contract by taking advantage of [its] position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442.

Delaware courts recognize that the "implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec*, 991 A.2d at 1125. Indeed,

ORDER – 17

the Supreme Court of Delaware has noted that "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." *Id.* at 1125-1126 (citation omitted). The Supreme Court of Delaware has also noted that when conducting this analysis, the Court must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. *Id.* "Parties have a right to enter into good and bad contracts, the law enforces both." *Id.*

As already discussed by this Court, Defendants in this matter did not engage in actions that were not reasonably anticipated by Plaintiff or contrary to the provisions of the SPA. Defendants bargained for the freedom to run the business as they saw fit, and they specifically rejected proposed provisions from the Shareholders that would have mandated certain obligations in the Development Plan. Moreover, Plaintiff Lilly has testified that he is unaware of any facts indicating that Endeon made many of the business decisions of which he complains now in bad faith. Dkt. #80, Ex. B at 116:11-14, 117:2-6 and 121:2-8. Likewise, Plaintiff Lilly testified that he is not aware of any facts that Emdeon's decision not to extend the deadlines for the Milestone Objectives was made in bad faith. *Id.* at 210:23-211:2.

Likewise, the Court finds that Defendants did not frustrate the Shareholders from completing their contractual obligations for the reasons discussed above. *See* Section III.D.

As a result, the Court also finds that Plaintiff's claim for breach of the covenant of good faith and fair dealing also fails as a matter of law.

## IV. CONCLUSION

Having reviewed Defendants' Motion for Summary Judgment, Plaintiff's Opposition thereto, the Reply in support thereof, the parties' Declarations and Exhibits, and the remainder of the record, the Court hereby finds and ORDERS:

1. Defendants' Motion for Summary Judgment (Dkt. #79) is GRANTED, and Plaintiff's remaining claims are dismissed in their entirety.

2. This case is now CLOSED.

DATED this 20th day of December, 2016.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE